Walburga Oesterreich v. Commissioner. Wilshire Holding Corporation v. Commissioner.
Oesterreich v. Commissioner
Docket Nos. 32946, 32954.
United States Tax Court
1953 Tax Ct. Memo LEXIS 336; 12 T.C.M. (CCH) 277; T.C.M. (RIA) 53085; March 16, 1953
Richard S. Brawerman, Esq., for Walburga Oesterreich. M. D. Fraider, Esq., 242 North Canon Drive, Beverly Hills, Calif., Russell E. Parsons, Esq., and Albert Jack Chotiner, Esq., for Wilshire Holding Corporation. Donald P. Chehock, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax of $141.16 for 1946 against Walburga Oesterreich and deficiencies against Wilshire Holding Corporation of $1,584 in declared value excess profits tax, $3,097.83 in excess profits tax and $1,834.06 in income tax, for 1945, and $2,798.20 in income tax for 1946. The only issue for decision is whether payments made by Wilshire Holding Corporation to Walburga Oesterreich for the taxable years were deductible *337 by the corporation as expenses for rent under section 23 (a) (1) (A) and returnable by Walburga as ordinary income or whether they were in whole or in part payments of purchase price of land. Findings of Fact Walburga Oesterreich, a widow, filed her individual income tax return for 1946 with the collector of internal revenue for the Sixth District of California. Wilshire Holding Corporation filed its return for the taxable years with the collector of internal revenue for the Sixth District of California. Walburga Oesterreich acquired three adjoining lots, 552, 553 and 554, in January 1926. One of the lots was on the corner of Wilshire Boulevard and Hamilton Drive in Beverly Hills, California. She paid $20,000 for three lots and thereafter spent $4,235.05 for paving and lighting assessments properly chargeable to capital account in respect of the lots, so that her adjusted basis for the lots on September 11, 1929 was $24,235.05. Wilshire Amusement Corporation was incorporated in 1929 by Albert H. and Albert J. Chotiner, father and son, for the purpose of building a motion picture theatre. They directed a real estate broker, operating in Beverly Hills, to find a suitable location *338 which they could lease and on which they could construct a theatre. The broker learned from Walburga that she would be willing to enter into a lease for the three vacant lots which she owned, he arranged a meeting between the Chotiners and Walburga and, after negotiations, Walburga and Wilshire Amusement Corporation entered into an agreement entitled "lease" dated September 11, 1929. The Chotiners decided, in the course of the negotiations, that additional land would be needed for the theatre which they desired to build and for that reason Wilshire Amusement Corporation purchased lot 555 and the northerly 40 feet of lot 556 at a total cost to it of $19,650. Wilshire conveyed that land to Walburga in the fall of 1929. Walburga is referred to as lessor and Wilshire Amusement Corporation is referred to as lessee throughout the agreement of September 11, 1929. It provides for payments called "rent" to be paid by the lessee to the lessor. It covers lots 552, 553, 554, 555 and the north 40 feet of lot 556 and provides that the lessor lets those properties to the lessee for a term of 67 years and eight months beginning September 1, 1929 and ending on the last day of April 1997. The lessee *339 agreed to pay the lessor total rent of $679,380 payable in monthly installments in accordance with a rental schedule. The rental schedule provided for an annual rental of $7,500 for the first 10 years, $12,000 for the succeeding 18 years and amounts becoming progressively smaller at the rate of $113.40 each year so that the rental for the 68th year was $7,500. The lessee agreed to pay all taxes and similar charges on the property. The lessee agreed to erect a new building on the premises to cost not less than $300,000 and to be completed not later than July 1, 1930. The lessor agreed to join in the execution of notes or debentures and in a deed of trust or mortgage covering the leased premises to secure a loan not to exceed $225,000 to be used in constructing the building. The lessee agreed to take out adequate fire insurance on the building and insurance to protect the lessee from claims arising out of the use of the premises. The agreement states that the lessee proposes to sublease a portion of the building for theatre purposes. The lease could be assigned by the lessee upon the terms stated therein and such an assignment would release the lessee of further obligations under the *340 lease. The lessor could declare the lease terminated in case of a default continuing longer than a period stated in the lease. The lessee had the right, but was not bound, to tear down any building which might be built on the premises for the purpose of reconstruction in accordance with the terms of the lease should the original building become obsolete or not suited to the purposes of the lessee. Any such replacement building was to cost not less than $325,000. One paragraph of the agreement was as follows: "The Lessor hereby promises and agrees that, upon the expiration of the term of this lease by lapse of time, and when all of the terms and conditions of this lease have been met and all of the rentals and other payments provided to be paid shall have been paid at the times and in the manner provided, the Lessor promises and agrees that she will then, upon the payment to her of the further sum of ten dollars ($10.00) in hand, convey or cause to be conveyed by grant deed to the Lessee free and clear of all encumbrance, all of the real property herein leased, without further or other consideration." The agreement was recorded in the Official Records of Los Angeles County. Walburga *341 Oesterreich, in entering into the agreement, was interested in receiving as much income from lots 552, 553 and 554 as was possible; she had no relatives or heirs in whom she was interested; she expected to die long before 1997; and she did not care what became of the title to the property after the term of the agreement. She did not want to sell the lots. She did not execute any deed for the property to be used in transferring title at the end of the period of the lease after April 30, 1997. The Chotiners, in having Wilshire Amusement Corporation enter into the agreement of September 11, 1929, were not interested in buying lots 552, 553 and 554, but desired a long-term lease of those lots. Wilshire Amusement Corporation changed its name to Wilshire-Hamilton Properties, Inc., shortly after September 11, 1929 and is hereafter referred to as Hamilton. Wilshire Holding Corporation, the petitioner, succeeded to the interest of Hamilton under the agreement of September 11, 1929 in August 1935. The agreement of September 11, 1929 has been carried out in accordance with its provisions. Hamilton and Wilshire Holding Corporation entered upon their books of account all amounts paid or payable *342 on account of their obligations under that agreement as rental expense and Walburga entered upon her books of account all amounts paid or payable on account of those obligations as rental income. The payers claimed deductions on their Federal tax returns for the amounts paid as rent and Walburga reported the amounts received as rent. Wilshire Holding Corporation paid Walburga $12,000 in each of the years 1945 and 1946 in accordance with the provisions of the agreement of September 11, 1929. Walburga, on her returns for 1945 and 1946, reported the $12,000 as income from rents. The Commissioner, in the notice of deficiency dated December 12, 1950, made no change in that item. Walburga received a letter from an Internal Revenue Agent in Charge indicating overassessments in her income tax for 1945 and 1946 and enclosing a report in which it was stated that she had reported rental income of $12,000 for the years 1945 and 1946 but investigation showed that the agreement under which those payments were made was "not a lease, but in effect an installment sale of the realty under Section 44 (b) of the Internal Revenue Code," and she overstated her income for each year *343 by $6,206.91 in that connection. She received another letter from the same source dated July 26, 1949 stating that the conclusion had been reached that the rents were correctly reported on her income tax returns. The Commissioner, in the notice of deficiencies to Wilshire Holding Corporation, dated December 12, 1950, held: "On each of your returns for the years 1945 and 1946 you deducted $12,000.00 as rent paid. Inasmuch as the so-called 'lease' under which these amounts were paid provides that the demised property shall be deeded to you for a nominal consideration upon the payment of a certain specified sum in monthly installments, including the above amounts, it is held that the monthly payments constitute capital expenditures and the claimed deductions are therefore disallowed." Lots 552, 553 and 554 were worth not more than $50,000 in 1929 and were worth not more than $100,000 in 1946. Wilshire Holding Corporation had not taken title to, was not taking title to, and had no equity in those lots at the end of 1946. The $12,000 payments made by Wilshire Holding Corporation to Walburga Oesterreich in 1945 and 1946 were ordinary and necessary expenses of Wilshire Holding Corporation *344 paid or incurred during the taxable years in carrying on its business and were rentals or other payments required to be made as a condition to the continued use or possession for the purpose of its business of lots 552, 553 and 554. Those payments were ordinary income of Walburga Oesterreich. All facts stipulated by the parties are incorporated herein by this reference. Opinion MURDOCK, Judge: Walburga and the predecessor of the corporate petitioner entered into the agreement in 1929 which was called a lease and which provided for payments called rent to be paid by the lessor to the lessee. The words they used are not controlling but are not without significance. Both parties have indicated consistently by their many actions for approximately 20 years that they originally intended it to be and always regarded it as a lease under which the payments were rentals. Walburga recorded and reported the payments annually as rents. The corporate petitioner and its predecessor recorded and deducted those payments as rents. The Commissioner raised no objection to those actions of the parties during all of that period and apparently it was not until December 14, 1948 that a Revenue Agent *345 first made the suggestion, later withdrawn, that the payments were not rentals but purchase price. A remainder interest after a 68-year lease in vacant lots such as these, which had a value in 1929 of not more than $50,000 at the most, was trivial in comparison to the annual rentals and would probably not equal half of the rent for the first month. The agreement is like a lease in that it requires payments for the use of the property over a long period of time. If the annual payments were to be regarded as purchase price, they would be out of proportion to the value of the lots. Walburga owned only vacant land in 1929 and the payments made prior to the beginning of 1947 created no equity in Wilshire Holding Corporation in lots 552, 553 and 554 since the then present value of the future payments to be made under the agreement far exceeded the value of those lots. It seems unrealistic, under all of the facts in this case, to hold that the payments during 1945 and 1946 were not rental payments deductible by the payer and returnable as income by the payee. The Court concludes that the Commissioner erred in the case of Wilshire Holding Corporation in denying the deductions of $12,000 claimed *346 on its returns. He did not err in determining the deficiency against Walburga Oesterreich. Decision will be entered for the respondent in Docket No. 32946 and under Rule 50 in Docket No. 32954.